IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 7, 2011

**STATE OF TENNESSEE v. MAURICE O. BYRD**

**Appeal from the Circuit Court for Montgomery County**
**No. 40600534    Michael R. Jones, Judge**

**No. M2010-02405-CCA-R3-CD _ Filed November 29, 2012**

Following a jury trial, the Defendant, Maurice O. Byrd, was convicted of aggravated robbery, felony first degree murder, and premeditated first degree murder. See Tenn. Code Ann. §§ 39-13-202, -402. The trial court merged the premeditated first degree murder conviction into the felony first degree murder conviction and sentenced the Defendant to life imprisonment. The trial court also sentenced the Defendant to eight years for the aggravated robbery conviction and ordered the sentence to be served concurrently with the life sentence for the felony first degree murder conviction. On appeal, the Defendant contends that the evidence was insufficient to sustain his convictions. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Carrie W. Gasaway, Clarksville, Tennessee (at motion for new trial hearing and on appeal); John E. Herbison, Clarksville, Tennessee (on appeal); and Reid H. Poland, III, Clarksville, Tennessee (at trial), for the appellant, Maurice O. Byrd.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Helen Owsley Young, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

On July 1, 2005, Frank Dowlen, Jr. went to the victim, Eric Payton's, apartment in Clarksville, Tennessee. At trial, Mr. Dowlen testified that he and the victim were "pretty good friends." According to Mr. Dowlen, he was going to the victim's apartment that day to pay the victim twenty dollars that he owed the victim and to buy some marijuana from the victim. Mr. Dowlen testified that his older brother, Alpha Omega Dowlen, drove him to the victim's apartment. Mr. Dowlen estimated that he got to the victim's apartment sometime between 10:30 and 11:00 a.m. that morning. Mr. Dowlen testified that he would usually enter the apartment from the back door, but on that morning he went to the front door to "just run in, run out real quick." Mr. Dowlen was "surprised" to find the front door "cracked open." Mr. Dowlen testified that he "stuck [his] head in" and called out the victim's name. Mr. Dowlen saw the victim in the living room "laid up under a blanket."

Mr. Dowlen testified that the blanket covered the victim's whole body, including the victim's head. Mr. Dowlen approached the victim, pulled up the blanket, and saw that the victim's "brain was blown out and his eyeball was sitting next to his face." Mr. Dowlen recalled that there was "a puddle of blood" underneath the victim as well as blood on the victim's face. Mr. Dowlen testified that the blood on the victim's face and in the "puddle" was already dry and not "wet." After finding the victim's body, Mr. Dowlen "just ran" out of the apartment and back to his brother's vehicle. Mr. Dowlen "went over to [a] friend's house and called the police . . . and told them there was a dead body" at the victim's apartment. Mr. Dowlen testified that he did not see a gun or anyone else at the apartment that morning. Mr. Dowlen denied having a gun with him that day and denied that he shot the victim.

Mr. Dowlen's brother testified that he drove Mr. Dowlen to the victim's apartment "earlier in the day, like mid-afternoon" and parked "right in front of the apartment building." Mr. Dowlen's brother stayed in the vehicle and waited on Mr. Dowlen as he went in the front door of the apartment. Mr. Dowlen "came out maybe a minute later, he was running -- he was screaming, 'Start the truck, start the truck.'" Mr. Dowlen told his brother that the victim was dead. Mr. Dowlen's brother then drove to a friend's house "and called 911." Mr. Dowlen's brother testified that Mr. Dowlen "was distraught . . . [and] really messed up, like he had [seen] a ghost or something." Mr. Dowlen's brother also testified that Mr. Dowlen did not have a gun with him that day nor did he have "a gun, drugs, or money" when they left the victim's apartment.

Sergeant Marty Watson of the Clarksville Police Department (CPD) was one of the first officers to arrive at the victim's apartment on July 1, 2005. Sgt. Watson testified at trial that he was dispatched to the victim's apartment around 11:56 a.m. and that he arrived at the apartment complex at 12:02 p.m. Sgt. Watson testified that when he arrived at the apartment complex, he was unsure which apartment to go to. Sgt. Watson "talked to some people

there" and then "the landlord showed up and he advised . . . [that] the guy left his back door open." Sgt. Watson and some other officers went to the back of the victim's apartment and entered through a patio door that "was open about a couple of inches." Sgt. Watson testified that the victim "was laying [sic] . . . ten or twelve feet inside from the back door . . . face down." The victim was "partially covered up with a blanket," there was "a towel laying [sic] under his face area," and a "pillow case" in front of him.

Sgt. Watson testified that upon seeing the victim's injuries, he knew that the victim was deceased. According to Sgt. Watson, the victim's "right eye was messed up and there was a wound to the back of his head also." Sgt. Watson observed that the blood on the floor and on the victim's face had "started to dry." Sgt. Watson found "a shell casing to the right" of the victim and a slug "underneath" the victim's arm. Sgt. Watson testified that there was no one in the apartment when the police arrived and that no weapons were recovered after a search of the apartment. Sergeant Timothy W. Saunders of the CPD testified that he collected the following evidence from the victim's apartment: one .380 caliber bullet, one shell casing, and one slug. Sgt. Saunders testified that the bullet was found "in a kitchen drawer" with no weapon or other ammunition with it. According to Sgt. Saunders, the shell casing was found "on the floor behind the victim, next to the table," and the slug was found "under the victim's right arm." Sgt. Saunders also testified that there were no firearms found in the victim's apartment.

Detective Brad Crowe of the CPD testified that he assisted with evidence collection at the victim's apartment on July 1, 2005. Det. Crowe recovered nine Lortab pills packaged in "small baggies that were tied up" from the door of the "freezer portion of the [victim's] refrigerator." Det. Crowe also recovered a "white plastic grocery sack" containing "some marijuana" from the freezer. Det. Crowe testified that he recovered twenty-four dollars from one of the kitchen cabinets. The money "appeared to have come out of a broken . . . canister that you would have flour or something in." The canister "looked like it had been broken and the money was laying right there with it." Det. Crowe also testified that no cocaine or weapons were recovered from the victim's apartment.

The police investigation into the victim's murder revealed that the night before, on June 30, 2005, the victim had a "going away" party at his apartment for his friend Arthur Lee Anderson, Jr. The party continued into the early morning hours of July 1, 2005, and several people were in and out of the victim's apartment that night. In addition to the victim and Mr. Anderson, the following people were at the victim's apartment that night: the victim's "best friend," Thomas Lloyd Cantrell; Christian Hope Morris Hutchins, who had gone to school with the victim; two of the victim's cousins, Mareo Santez Kizer and Kedrick Phillips; one of the victim's neighbors, Anthyony Townsend; and the Defendant. Mr. Kizer testified that everyone at the victim's apartment that night was "[j]ust drinking and smoking a little weed,

just trying to have a little party." At trial, all of the witnesses who had been to the party testified that they were intoxicated from various drugs that night. Ms. Hutchins testified that every time she visited the victim's apartment "there was something going on . . . [j]ust drugs and drinking, [and] people coming in and out."

At the time of his death, the victim was unemployed, supported himself by "selling drugs," and paid all of his bills with cash. The victim's sister, Jennifer Payton Adams, testified that the victim "lived completely on cash." Mr. Cantrell testified that during the morning of June 30, 2005, he went with the victim to purchase the following drugs: a "quarter pound" of marijuana packaged in "one of them little hand grocery bags," a "baggie of Lortab" pills, a "couple" of ecstasy pills, and "a ball, a ball and a half of cocaine." Mr. Cantrell explained that he was referring to an "eightball" of cocaine and that an eightball contained 3.5 grams of cocaine. Mr. Cantrell estimated that the victim bought between seven and eight grams of cocaine that day. Mr. Cantrell testified that after the victim purchased the drugs he had approximately $500 in cash left over. According to Mr. Cantrell, the victim took the drugs and cash back to his apartment.

Mr. Phillips testified that the victim "normally kept" his money in "a cookie jar in [a] cabinet in the kitchen." According to Mr. Phillips, he opened the cookie jar on the night of the party to put sixty dollars in it. Mr. Phillips testified that the jar was full of money, mostly twenty dollar bills. Mr. Phillips estimated that there was $1,000 in the cookie jar that night. Mr. Phillips also testified that the victim had told him that he was having a party because "he made" $1,000 that day. However, Mr. Phillips admitted that he did not take the money out of the cookie jar to count it and could only estimate how much was inside. Mr. Phillips also testified that, during the party, he saw "around a quarter pound" of marijuana in the victim's freezer. Ms. Hutchins testified that she saw marijuana, ecstasy, and cocaine at the victim's apartment that night. However, Mr. Kizer denied that anyone at the party used cocaine that night.

Mr. Cantrell testified that he went to the victim's apartment around 3:00 a.m. on July 1, 2005, and there were several people at the victim's apartment. Mr. Cantrell stated that he went to the victim's apartment that morning to get some marijuana, but when he got there, the victim was passed out "lying in front of the TV, diagonal with his head like facing towards the coffee table, sleeping." Because the victim was asleep, Mr. Cantrell only stayed at the apartment for approximately ten minutes. Mr. Kizer testified that the victim was sick and throwing up "from alcohol," so they put a blanket on him and had him lie down in front of a fan. Ms. Hutchins, Mr. Kizer, and Mr. Phillips all testified that they left the victim's apartment together "early in the morning." The victim was still asleep on the living room floor when they left. They offered to give the Defendant "a ride to where he wanted to go," but the Defendant declined and said that "he wanted to stay to make sure that [the victim]

was all right." The Defendant and the victim were the only people left at the apartment when Ms. Hutchins, Mr. Kizer, and Mr. Phillips left that morning.

Ms. Hutchins estimated that she, Mr. Kizer, and Mr. Phillips left sometime between 6:00 and 7:00 a.m. on July 1, 2005. Ms. Hutchins testified that, despite the fact that she had stayed up all night and was high on ecstasy, she had to work at a daycare at 8:00 that morning. When they left, "a purple Neon" that the Defendant had been driving was parked in a gravel lot behind the apartment building. Tammy Compton, the victim's downstairs neighbor, testified that she got up around 3:00 a.m. on July 1, 2005, to let her dog out. Ms. Compton saw three cars parked in the back lot, including "a purple car." The same three cars were in the back parking lot when Ms. Compton got up at 5:30 that morning. Ms. Compton testified that when she left for work at 8:00 a.m., "only the purple car [was] there at that time."

Another of the victim's neighbors, Mr. Townsend, testified that he had been at the victim's apartment the night before but left around 2:00 a.m. because he had to work that morning. Mr. Townsend testified that he was running late that morning and got to work around 7:30 a.m. When he left for work that morning, Mr. Townsend "noticed the Defendant's car was still parked in the back" lot. Mr. Townsend testified that he forgot his lunch that morning so he went back to his apartment around 9:00 a.m. According to Mr. Townsend, the Defendant's car was no longer in the back lot, but parked in front of the victim's apartment.

Mr. Anderson testified that he had met the victim through the Defendant and that the party at the victim's apartment on June 30, 2005, was for him. Mr. Anderson explained that he was about to move to Kentucky because he was "ready to go" and that he had been living in Clarksville under an assumed name because he "was on the run" from a "drug charge in Alabama." Mr. Anderson testified that the Defendant had been helping him pack and that sometime between midnight and 1:00 a.m., the Defendant drove him to the victim's apartment in a purple Neon. The victim's cousin, Mr. Phillips, took Mr. Anderson home sometime between 4:00 and 5:00 a.m. Mr. Anderson explained that he left the party "early" because he had to be in court over a traffic ticket at 8:00 a.m. Mr. Anderson's brother-in-law, Eddie Holliness, picked him up around 7:30 a.m. and took him to the municipal court. After court, the two men then went to a "junk yard" to look for a transmission. Mr. Anderson testified that while he was at the "junk yard," he spoke with the Defendant on a cell phone and told the Defendant to stay at his house until he got back so the Defendant could help him with some more packing. The Defendant was not at Mr. Anderson's house when Mr. Anderson and Mr. Holliness returned around 11:00 a.m.

At trial, several witnesses, including Mr. Townsend and Mr. Anderson, testified that the Defendant did not have a job, usually did not have any money, was essentially living in the victim's apartment because he could not afford to stay anywhere else, and "like[d] to use" cocaine. Mr. Townsend and Mr. Anderson both testified that they never saw the Defendant pay for anything except for gasoline. However, on July 1, 2005, the Defendant met with his ex-girlfriend, Sharmar Graham, to take her and her children shopping to get "some book bags and some school clothes." Ms. Graham testified that the Defendant bought her some shoes that day as well, but she could not remember if the Defendant bought any clothes for himself. Ms. Graham further testified that she met the Defendant around 11:30 a.m. that day and estimated that the Defendant spent around $200. Ms. Graham also testified that despite the fact that the Defendant did not have a job or his own place to live, he had purchased things in the past for her and her children. Mr. Anderson testified that later that night, the Defendant came to his house to help pack. According to Mr. Anderson, the Defendant looked "clean" and was wearing "new clothes and new shoes."

Mr. Anderson testified that sometime during the afternoon on July 1, 2005, he learned that the victim had been murdered. According to Mr. Anderson, when the Defendant came over to his house that night the Defendant did not seem upset and did not say anything about the victim's death. Likewise, Mr. Cantrell testified that he used to speak to the Defendant everyday, but he did not see the Defendant for almost two days after the victim's death. Mr. Cantrell recalled that the Defendant did not go to the victim's funeral and did not "show any emotion over" the victim's death. However, Ms. Graham testified that she was with the Defendant when he learned of the victim's death and that the Defendant became "upset" and cried.

Mr. Anderson testified that about an hour after the Defendant arrived at his house on the evening of July 1, 2005, police officers arrived and took the Defendant, Mr. Anderson, and his wife, Latricia Holliness, to the police station for questioning regarding the victim's murder. Mr. Anderson testified that he did not give the police officers his real name but that he did tell them what he knew about the victim's death. Ms. Holliness testified that at one point, she was alone in a room with the Defendant when the Defendant gave her the keys to the purple Neon and "mentioned" something about a gun. Ms. Holliness stated that she gave the keys to her husband. Det. Crowe testified that he administered a gunshot residue (GSR) test on the Defendant's hands that night. According to Det. Crowe, the Defendant became "very nervous" when told about the GSR test. The Defendant told Det. Crowe that "he had fired off fireworks that day." Det. Crowe lied to the Defendant and told him that the GSR test could distinguish between handling fireworks and shooting a gun. When told this, the Defendant "recanted the first statement," said that he had "been shooting guns too," and then said that he shot targets "a lot." Det. Crowe testified that the Defendant "became very nervous and was very upset" about the GSR test.

Dr. Staci Turner, an expert in forensic pathology, testified that she performed an autopsy on the victim on July 2, 2005. Dr. Turner concluded that the cause of death was a gunshot wound to the head. Dr. Turner testified that the bullet entered "the left back of the head . . . and then . . . went through the scalp, the skull, [and] the brain and then came out of the right eyelid." Dr. Turner also testified that there was no soot or stippling present on the victim's body which lead her to conclude that "the gun was fired roughly greater than three feet away from the head." Dr. Turner was unable to determine a time of death for the victim. The police investigation ultimately revealed that the bullet that killed the victim had been fired from a Hi-Point Firearms .380 caliber handgun.

Several witnesses testified that they had seen the Defendant with a .380 caliber handgun both before and after the victim's murder. Mr. Cantrell testified that the Defendant "owned" a .380 caliber handgun and that he had seen the gun at the victim's apartment prior to the murder. Mr. Cantrell also testified that both the Defendant and the victim handled the gun and that the gun never left the victim's apartment. Mr. Cantrell further testified that the victim had showed him a "pinch mark" where the gun had pinched the victim's hand. Mr. Cantrell testified that he assumed the pinch had come from a "crack in the handle," but he never actually saw a crack on the gun. Mr. Kizer also testified that the victim and the Defendant owned "a little black pistol" with "a silver strip like at the top."

Mr. Townsend testified that two or three weeks before the victim's murder he saw the Defendant at the victim's apartment with a Hi-Point .380 with a sliver stripe and a "scratch on the top somewhere." Mark David Vond, a friend of both the victim and the Defendant, testified that he saw the Defendant "a couple of weeks" before the victim's murder at the victim's apartment with a Hi-Point .380. Mr. Holliness testified that about a month before the victim's murder he saw the Defendant at Mr. Anderson's house with a .380. Mr. Anderson testified that about a week before the victim's murder he saw the Defendant with a "black .380" with a scratch on it. Mr. Phillips testified that on the night of the party he saw "a small black .380 with a gray stripe down the barrel" and that the gun "was [either] tucked in the couch or under [the] coffee table." Mr. Phillips further testified that he had seen the gun in the apartment before "just laying around" and had previously seen the Defendant with the gun.

Mr. Cantrell testified that two days after the victim's murder, the Defendant drove him in the purple Neon to a house where the Defendant had been staying. The Defendant went into the house and came out "about ten minutes" later with "a black .380 with a silver pin stripe going like around the barrel." Mr. Cantrell testified that this was the same gun he had previously seen at the victim's apartment. Robert King testified that he was friends with the Defendant from their days in the Army. Mr. King testified that a week or two after the victim's murder he saw the Defendant with a black handgun.

On December 27, 2005, Officer James Kelly Crow of the Cumberland City Police Department recovered "a Hi-Point .380 caliber handgun" from an individual named Karl Banks during a traffic stop. Special Agent Steve Scott of the Tennessee Bureau of Investigation (TBI), an expert witness in the area of firearms identification and ballistics, testified that the handgun recovered from Mr. Banks was the same handgun that had been used to kill the victim. Mr. Cantrell testified at trial that the gun recovered from Mr. Banks was a "[t]win" of the gun he had previously seen the Defendant with. Likewise, Mr. Phillips testified that the gun recovered from Mr. Banks was "the exact same gun" he had seen the Defendant with at the victim's apartment. Mr. Kizer also testified that the gun recovered from Mr. Banks "look[ed] like" the Defendant's gun.

The gun was registered to Derrick Isaiah Poe, a Staff Sergeant in the United States Army who was stationed at Fort Campbell in 2005. Mr. Poe testified that in 2005 he owned a black .380 caliber Hi-Point handgun that he had not seen since the Spring of 2005. According to Mr. Poe, in April 2005, he went to "Kickers' Club" with the Defendant. Mr. Poe testified that he knew the Defendant through a "mutual friend." Mr. Poe testified that he was intoxicated that night and the Defendant drove him to the club. According to Mr. Poe, he "left the gun in the trunk of [the Defendant's] car." When they arrived at the club, Mr. Poe met with Mr. Anderson and the two men went inside. The Defendant was unable to get into the club that night. Mr. Poe testified that he "ended up leaving the club early with a female" and realized the next day that he had left his gun in the Defendant's car. Mr. Poe further testified that he tried to get in touch with the Defendant but he was unable to do so. Mr. Poe reported that his gun was stolen on May 1, 2005. Mr. Poe stated in the report that he believed the Defendant had stolen his gun. Mr. Poe admitted at trial that he lied in the police report when he stated that his gun had been stolen from his apartment after a party. Mr. Poe explained that he lied to the police because he was "scared" and believed that it was illegal to "ride around . . . with a gun in the car." Mr. Poe testified that he had not seen his gun since the night he went to the "Kickers' Club" with the Defendant and Mr. Anderson.

Jamar Christian Ashe, a convicted drug dealer, testified that he had met the Defendant "two times" while selling cocaine. Mr. Ashe testified that the second time he met the Defendant at an apartment complex and the Defendant offered to sell him "a pistol." According to Mr. Ashe, the Defendant told him the gun was "straight," and Mr. Ashe offered to give the Defendant "two grams of powder for it." Mr. Ashe recalled that "the whole bottom piece" of the gun was black and that "the top piece that you pull back, that was like grayish color." Mr. Ashe testified that in November 2005, he gave the gun he purchased from the Defendant to Mr. Banks. According to Mr. Ashe, he received a phone call from Mr. Banks and learned that Mr. Banks had been "jumped" by several men at a local club. Mr. Ashe testified that he met with Mr. Banks that night and gave the Defendant's gun to Mr.

Banks. Mr. Ashe claimed that he did not know anything about the victim's murder when he bought the gun from the Defendant and when he gave the gun to Mr. Banks.

At trial, Mr. Ashe admitted that he had lied to the police and told them several different versions of how Mr. Banks got the Defendant's gun. Mr. Ashe admitted that he had first told the police that Mr. Banks had bought the gun directly from the Defendant. Mr. Ashe claimed that Mr. Banks had told him this during a phone conversation. Mr. Ashe then told the police that he met with the Defendant and set the Defendant up with Mr. Banks after the Defendant asked him if he knew of anyone that needed a gun. Mr. Ashe also admitted that he lied to the police and told them that he had never touched the gun. Mr. Ashe eventually told the police that he had stolen the gun from the Defendant's car. Mr. Ashe testified that he just wanted "to tell [the jury] the whole truth" and that his testimony about buying the gun from the Defendant was truthful.

Mr. Banks testified that he was arrested on December 27, 2005, and that the gun he had received from Mr. Ashe was in the car that day. Mr. Banks admitted that when he was arrested he lied to the police and told them that he had gotten the gun "from a smoker[,] . . . a white guy." Ashley Plant testified that she was with Mr. Banks when he received the gun from Mr. Ashe. Ms. Plant testified that in November 2005, Mr. Banks had gotten "into a fight with a dude" at the Starlight Lounge. Mr. Banks called Mr. Ashe to get a gun because he had been hit "in the face with a gun." Ms. Plant testified that Mr. Ashe got into the car with her and Mr. Banks and then gave Mr. Banks a gun. However, Mr. Ashe testified that Ms. Plant was not present when he gave Mr. Banks the gun and that Ms. Plant "didn't know about the gun."

The Defendant did not testify at trial. However, the Defendant gave several statements to the police that were introduced into evidence at trial. The Defendant first told police that he was in and out of the victim's apartment throughout the night of June 30, 2005, and the early morning hours of July 1, 2005. The Defendant claimed that he took Mr. Anderson home from the victim's apartment around 4:30 a.m. The Defendant also claimed that he left the victim's apartment between 7:30 and 8:00 a.m. The Defendant further claimed that he took Mr. Anderson to court at 10:00 a.m. The Defendant then claimed that he did not leave his house until around 1:30 p.m. when he went "school shopping" with Ms. Graham. In a later statement, the Defendant again claimed to have been in and out of the victim's apartment all night. However, the Defendant claimed that he took Mr. Anderson to a gas station "to catch a ride" at 4:30 a.m. The Defendant again claimed to have left the victim's apartment at 7:30 a.m., but did not claim to have taken Mr. Anderson to court that morning. The Defendant also claimed not to have left his house until 1:30 p.m. when he went shopping with Ms. Graham.

The Defendant denied killing the victim or knowing "who killed" the victim. The Defendant also denied that he was so "high" that night that he could not remember what happened. The Defendant denied owning or possessing "a gun in the last thirty days." However, the Defendant stated that the GSR test performed on him would "probably show up positive because [he] had shot a gun probably a day or two before that when [he] went to the country for the 4th of July." The Defendant further stated that the gun he had shot belonged to him. The Defendant described the gun as a "black gun" and stated that the last place he had seen the gun was at the victim's apartment. The Defendant admitted that he had given his car keys to Ms. Holliness while they were at the police station, but he denied that he asked her "to take a gun out" of his car. The Defendant stated that he was wearing blue sweat shorts and a "gray or blue long shirt" on the day the victim was killed. The Defendant admitted that the police had confiscated a pair of his shoes, which had blood on them. However, the Defendant stated that the blood did not belong to the victim. Instead, the Defendant stated that it belonged to "[s]omeone [he] got into a fight with."

Detective Alan Charvis of the CPD testified that he was the lead investigator in this case. Det. Charvis testified that the Defendant's shoes had been tested and that the blood on them did not belong to the victim. Special Agent James Russell Davis, II, of the TBI, an expert in forensic science, testified that he tested several items of clothing from the Defendant for gunshot primer residue. This included "two shirts," a pair of blue shorts, a gray tank top, and a gray t-shirt. Special Agent Davis testified that none of the clothing tested positive for gunshot primer residue. Special Agent Davis explained that there could be several reasons for the negative test results: that the Defendant had not fired a gun, that the Defendant had fired a gun but had not worn those items of clothing, that the gun "did not emit very much gunshot residue," or that the items of clothing had been washed. Special Agent Davis also testified that he reviewed the results of the GSR test Det. Crowe had performed on the Defendant's hands. According to Special Agent Davis, "[e]lements indicative of gunshot residue were absent" from the samples collected from the Defendant. However, Special Agent Davis explained that these results did not "eliminate the possibility that the [Defendant] could have fired, handled, or was near a gun when it fired." Special Agent Davis further explained that washing or rubbing the hands could remove GSR and that the test results were not conclusive one way or the other.

In addition to this evidence, several witnesses testified about the relationship between the Defendant and the victim. Mr. Cantrell testified that the two men had a "real good" relationship and that the Defendant was at the victim's apartment "everyday." Likewise, Mr. Kizer testified that the two men were friends and that the Defendant was at the victim's apartment every time Mr. Kizer visited the victim. Mr. Phillips also testified that the Defendant and the victim were friends. Mr. Townsend testified that the Defendant and the

victim were "good friends" and that he saw the Defendant at the victim's apartment "[a]lmost everyday."

## ANALYSIS

The Defendant contends that the evidence was insufficient to sustain his convictions for aggravated robbery, felony first degree murder, and premeditated first degree murder. Citing State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971), the Defendant argues that the State's case against him was based solely upon circumstantial evidence and that the State failed to present proof that excluded every other reasonable hypothesis save his guilt. The State responds that in State v. Dorantes, 331 S.W.3d 370 (Tenn. 2011), our supreme court overruled Crawford and held that circumstantial evidence should be treated the same as direct evidence when determining the legal sufficiency of the evidence. Based upon the new standard announced in Dorantes, the State responds that the evidence was sufficient to sustain the Defendant's convictions.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Our supreme court recently clarified that circumstantial evidence is as probative as direct evidence. Dorantes, 331 S.W.3d at 379-81. In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting Crawford, 470 S.W.2d at 612) (quotation marks omitted). Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. The reason for this is

-11-

because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . [and] [i]f the jury is convinced beyond a reasonable doubt, we can require no more." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

## I. Aggravated Robbery and Felony First Degree Murder

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). An aggravated robbery is a robbery "[a]ccomplished with a deadly weapon" or where "the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-402(a). Felony first degree murder is defined as the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery . . . ." Tenn. Code Ann. § 39-13-202(a)(2).

The Defendant argues that the evidence was insufficient to sustain his conviction for aggravated robbery because "[g]iven that the evidence shows that [the victim] was asleep, the instant record supports the hypothesis that the use of force or violence would have been unnecessary to accomplish any taking of property" and that "[t]he prosecution has failed to negate or rebut that hypothesis; therefore, the evidence is insufficient to support [a] conviction of robbery or aggravated robbery." The Defendant further argues that because the State failed to "negate or rebut" his theory that the money was taken without the use of violence, the evidence is also insufficient to sustain his conviction for felony first degree murder. The Defendant explains in his brief that "[i]f the evidence supports a logical inference that the killing occurred in perpetration of a specified felony, but also supports a logical inference that the killing occurred collateral to an antecedent felony, that evidence is insufficient to support conviction of felony murder."

However, the State correctly notes that the Defendant's arguments are based entirely on legal precedents explicitly overruled by our supreme court in Dorantes. The Defendant's assertion that because his conviction was based solely upon circumstantial evidence the State was required to rule out every reasonable hypothesis except that of guilt is simply no longer the law in Tennessee. Instead, circumstantial evidence alone is sufficient to sustain a conviction and is treated the same as direct evidence when weighing the sufficiency of the evidence. See Dorantes, 331 S.W.3d at 381. The Dorantes standard recognizes that the jury is in a better position than this court to weigh the evidence and decide between the competing plausible theories presented by the State and the defendant. Accordingly, this court's duty on appeal is "not to contemplate all plausible inferences in the [d]efendant's favor, but to

-12-

draw all reasonable inferences from the evidence in favor of the State." Sisk, 343 S.W.3d at 67.

In the present case, the evidence revealed that the Defendant was unemployed and consistently had little or no money. In the weeks before the murder, the Defendant was repeatedly seen in the victim's apartment with a black Hi-Point .380 caliber handgun that several witnesses testified was identical to the murder weapon. Mr. Cantrell testified that the day before the murder, the victim bought a significant amount of drugs including seven to eight grams of cocaine and had $500 in cash remaining after the purchase. Mr. Phillips testified that the victim kept his cash in a cookie jar in the kitchen and that on the night of June 30, 2005, he saw what he estimated to be $1,000 in the cookie jar. Ms. Hutchins, Mr. Kizer, and Mr. Phillips testified that when they left the victim's apartment between 6:00 and 7:00 a.m. on July 1, 2005, the victim and the Defendant were the only people at the apartment.

The Defendant's car, a purple Neon, was seen in the back parking lot at 8:00 a.m. by one of the victim's neighbors. At approximately 9:00 a.m., another neighbor saw the Defendant's car parked in front of the victim's apartment. Mr. Dowlen testified that the front door of the victim's apartment was cracked open when he arrived after 11:00 a.m. When police searched the victim's apartment they recovered the marijuana and Lortab pills the victim had purchased the previous day; however, the cocaine was missing. Likewise, the police recovered a broken container with twenty-four dollars on top of it and no other money was found in the victim's apartment. The Defendant went to Mr. Anderson's house sometime before 11:00 a.m. that morning and later went shopping with his ex-girlfriend. Ms. Graham estimated that the Defendant spent $200 on her and her children. The Defendant also bought new clothes and shoes for himself that day. Witnesses saw the Defendant with a black .380 handgun after the murder. Mr. Ashe testified that the Defendant sold him a black .380 handgun for two grams of cocaine, and that he later gave the gun to Mr. Banks. When police recovered the gun from Mr. Banks, it was determined to have been the murder weapon.

Based upon the foregoing evidence, the State established a reasonable inference that the Defendant robbed the victim of his cocaine and the hundreds of dollars that had been in the victim's cookie jar using a deadly weapon, the .380 caliber Hi-Point handgun. During the commission of the aggravated robbery, the Defendant shot the victim in the head, killing him. It was the province of the jury to weigh the evidence, judge the credibility of the witnesses, resolve any conflicts in the testimony, and choose between the competing theories presented by the State and the Defendant. The State presented sufficient evidence to create a reasonable inference that the Defendant robbed the victim using a deadly weapon and during the course of the robbery, shot and killed the victim. Accordingly, we conclude that

the evidence was sufficient to sustain the Defendant's convictions for aggravated robbery and felony first degree murder.

## II. Premeditated First Degree Murder

Premeditated first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted). The element of premeditation only requires the Defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

The Defendant argues that the evidence presented at trial did not establish the existence of premeditation. However, the evidence at trial established that the victim was unarmed and laying on the floor when he was shot. Several witnesses testified that the victim had been sick the night before and was asleep on the floor that morning. There was no evidence of provocation by the victim, nor was there any evidence that the Defendant attempted to aid the victim. Instead, the Defendant left the victim to die on the floor of his apartment. Several months before the murder, the Defendant stole the murder weapon from Mr. Poe. After the murder, the Defendant gave his keys to Ms. Holliness and said something to her about there being a gun in his car. The Defendant eventually sold the murder weapon to Mr. Ashe for two grams of cocaine. In the hours after the murder, the Defendant went shopping with his ex-girlfriend and her children. Witnesses testified that the Defendant did not appear to be upset about the victim's death and that he did not attend the victim's funeral

despite their previous friendship. Accordingly, we conclude that the evidence was sufficient to establish premeditation and to sustain the Defendant's conviction for premeditated first degree murder.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE